## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| In re:  William Kenneth Reimer,<br><br>Debtor. | Bankruptcy No.: 18-30752<br><br>Chapter 7 |
| Gene W. Doeling, as Bankruptcy Trustee,<br><br>Plaintiff,<br><br>vs.<br><br>William Kenneth Reimer,<br><br>Defendant. | Adversary No.: 19-7072 |

## MEMORANDUM AND ORDER

Plaintiff Gene W. Doeling, Chapter 7 Bankruptcy Trustee, filed an Amended Adversary Complaint seeking denial of Debtor/Defendant William Kenneth Reimer's bankruptcy discharge under 11 U.S.C. § 727(a)(2), (4) and (6).  Doc. 47.   In his Answer, Debtor denied the Trustee is entitled to the relief he seeks.

The Court tried this adversary proceeding on February 2 and 3, 2021.  At the close of evidence, the Trustee moved to amend his Complaint to conform to the evidence under Rule 15(b)(2) of the Federal Rules of Procedure made applicable in this proceeding by Rule 7015 of the Federal Rules of Bankruptcy Procedure.  Specifically, the Trustee seeks to add a cause of action under 11 U.S.C. § 727(a)(5), alleging Debtor failed to satisfactorily explain the disposition of a $35,765 withdrawal from Debtor's bank account.  Debtor opposed the motion, arguing it is untimely.

1

This adversary action is a core proceeding under 28 U.S.C. § 157(b)(2)(I).  The

Court has jurisdiction under 28 U.S.C. §§ 1334 and 157, and it has authority to enter a

final order in this matter.  This opinion constitutes findings of fact and conclusions of law

in accordance with Federal Rule of Bankruptcy Procedure 7052.

I.    **FACTS**

   A.    **General Background**

Debtor is a 68-year-old man, who worked in the railroad maintenance and

construction industry most of his adult life.  Except for a brief period when he worked as

a "roughneck" on an oil rig, Debtor worked for Burlington Northern Railroad or its

predecessor for approximately 19 years, beginning at age 19.

In 1988, while he was still working for Burlington Northern Railroad, Debtor

formed R & R Contracting, Inc.  He owned a 100% interest in this corporation at all

relevant times.  R & R performed railroad construction, design and repair.  R & R

completed three or four projects in its first year of business.  R & R's business increased

in the next few years, prompting Debtor to resign his position with Burlington Northern

Railroad in 1990 and work full time for R & R.

Although R & R began by performing work in the Grand Forks, North Dakota,

area, it eventually contracted for projects in Minneapolis, Denver, St. Louis, Alabama,

Texas, Canada and Chile.  R & R completed various projects for grain facilities, oil

refineries, plastic companies and railroad companies, such as Amtrak, Canadian Pacific

and Burlington Northern Railroad.  Debtor testified that at its height, R & R realized

gross receipts of approximately $50 million.

In 2015, R & R suffered several financial setbacks.  Although R & R's "operations

were doing really well," Debtor claims R & R was in "financial distress" because two

shortline railroads failed to make the payments required under their contracts with R & R. At trial, Debtor estimated that R & R "lost $8 million" as a result of these contracts, ultimately leading to its downfall. Although Debtor sold "a lot of his assets to keep R & R going," it was "impossible" for R & R to obtain financing because of the "big loss." Debtor testified that he received his last check from R & R in May 2018. R & R stopped doing business in the summer of 2018.

At trial, Debtor characterized himself as a "serial entrepreneur." Beginning in the late 1990s, Debtor invested in various business ventures. At one point, he owned four or five laundromats and other small businesses. For example, in 2015, Debtor owned an interest in Legendary Motorsports, LLC, also known as Legendary Cycles, LLC, which sold recreational vehicles, including motorcycles, four-wheelers and snowmobiles. Debtor was not involved in the day-to-day operation of Legendary. According to Debtor, poor general managers and a downturn in the motorcycle business caused him to lose several hundred thousand dollars in this business. Legendary's owners closed the store and sold all its assets in late July 2018.

As part of the liquidation process, Legendary sold everything, including inventory and shelving. At trial, Debtor testified that he did not know the details of these transactions, including net sale proceeds, claiming he was "paying bills as [the liquidation] went and was making sure everything was cleaned up, things like that. So what the final number is, I am not sure." Debtor deposited his share of the sale proceeds from Legendary's inventory and "other items" in an account held by Blue Sky

Development and Leasing, LLC, a business in which Debtor owned a 100% interest.[1]
On August 1, 2018, Blue Sky transferred $148,633.77 into Debtor's personal bank
account.[2]  See T-9.  When asked about the source of this fund transfer, Debtor testified,
"I would assume that [money] is the proceeds from the other items that were sold in the
store."

R & R's financial difficulties prompted Debtor to sell Blue Sky's assets, including
the building Legendary leased in Fargo, North Dakota.   According to a settlement
statement dated July 31, 2018, Blue Sky sold this building for $725,000.  The settlement
statement also reveals that, after paying its loan to Bank Forward in the sum of
$708,725.15, taxes, fees and other sale-related expenses, Blue Sky received no
proceeds from the sale of this real estate.  See T-8.

Debtor's wife, Rhonda Reimer, is also a business owner.  She is the sole owner
of Allrail Services, LLC.  Debtor's and Rhonda Reimer's son, Reed Reimer, is Allrail's
President.  Debtor purchased Allrail—a preexisting company with headquarters,
equipment, and a job site in Chicago—as a gift for Rhonda Reimer in 2010.  Rhonda
Reimer testified that Debtor is not involved in Allrail.

Allrail and R & R shared office space, some in Grand Forks and some in
Minneapolis.  The two companies also shared the services of a certified public

---

[1] Blue Sky owned the buildings where Legendary and R & R operated as well as
condominiums and townhouses it leased to tenants.  Blue Sky also owned equipment
that R & R and other companies used in their operations.

[2] In response to a question asking whether there was a reason Blue Sky
transferred the sale proceeds to Debtor, as opposed to Legendary or another entity,
Debtor answered, "I can't give you an honest answer, but I would say it was probably
just easier to transfer it over there and transfer it back over here. There were two
different banks involved."

accountant, who performed accounting work for both businesses.  At trial, Reimer testified that he knew that "R & R borrowed money from Allrail at certain times to cover certain costs."  R & R employed both Debtor and Rhonda Reimer.

In May 2018, Rhonda Reimer's health and safety position at R & R ended, so she increased her involvement with Allrail.  According to Rhonda Reimer, she could not find Allrail's corporate documents.  Consequently, she signed new Articles of Organization on June 19, 2018, and submitted the documents necessary to register Allrail as a corporation in North Dakota, Illinois and Michigan in July and August 2018.[3]

Initially, Allrail performed a large portion of its work in Illinois.  At the time Debtor petitioned for bankruptcy relief in December 2018, Allrail performed work under two contracts.  Under a contract with Union Pacific Railroad, Allrail performed maintenance at Union Pacific Railroad's yard in Chicago.  Pursuant to its contract with Kellogg Company, Allrail moved railroad cars in Michigan.  Before Allrail received its contract with Kellogg, R & R performed this work under a contract with Kellogg.[4]  In the summer or early fall of 2019, the contract with Union Pacific terminated.  Currently, Allrail's only "business" is with Kellogg.  Although it has "worked in a loss" for "the last year or so," Rhonda Reimer draws an income from Allrail every year.

---

[3] Prior to June 19, 2018, Allrail was organized as a sole proprietorship.

[4] In May or June 2019, R & R informed Kellogg that it was closing and could no longer perform on the contract.  Kellogg advertised the contract, and Allrail bid and won the contract.  In August 2018, Allrail began performing work under the contract. According to Rhonda Reimer, Allrail is not using any R & R equipment to move railroad cars as required by the Kellogg contract.

B.      **Bankruptcy**

In the summer of 2018, Debtor contacted the Vogel Law Firm about the possibility of petitioning for bankruptcy relief.  In November or December 2018, Debtor gathered documents and began completing bankruptcy schedules.  On December 21, 2018, Debtor petitioned for bankruptcy relief under Chapter 7 of the Bankruptcy Code. Debtor testified that his personal liability for business debt resulting from guaranties led to his decision to file the petition.

Debtor filed his original bankruptcy schedules on January 4, 2019.  He estimated that the value of his assets totaled $2,715,558.49 and his liabilities to dozens of business and personal creditors totaled $12,757,479.73.  T-1.  Debtor signed the schedules, swearing that the information in them was true and accurate under penalty of perjury.  On February 4, 2019, Debtor amended his bankruptcy schedules because "some things were brought to [his] attention that he forgot in the first place."  See D-101. The Trustee conducted the meeting of creditors on February 8, 2019.  Following the meeting of creditors, Debtor amended his schedules on March 20, 2019.  D-104. Debtor made no further amendments to his bankruptcy schedules.

C.      **Transfers**

1.      **Transfer of $2,000 to Reed Reimer on December 25, 2017**

Approximately one year before his bankruptcy, Debtor gave $2,000 to his son, Reed Reimer, on December 25, 2017.  Debtor did not list this transfer in his original bankruptcy schedules. See T-1.  According to Debtor, the gift was for his granddaughter's college education, and his failure to include this gift on his original

schedules was an oversight.  He listed the $2,000 gift on his amended schedules filed on February 4, 2019.  D-103.

### 2.    Transfer of $6,500 to Rhonda Reimer on June 4, 2018

On June 4, 2018, Debtor transferred $6,500 to Rhonda Reimer to "fund her retirement."  At trial, the Trustee asked Debtor if there was a "reason you were transferring thousands of dollars to your wife when your source of income was drying up?"  Debtor responded, "I didn't think about why I was doing it, I just did it. I mean, it's just what you do, transfer money back and forth for retirement."  Debtor listed this transfer in his original bankruptcy schedules.[5]  T-1.

### 3.    Transfer of $37,868.77 to Rhonda Reimer on August 2, 2018

As discussed above, Debtor deposited $148,633.77 in proceeds from the sale of Legendary inventory and other property in Blue Sky's account and then transferred this sum to a Bank Forward account in his name only on August 1, 2018.[6]  T-9.  One day later, Debtor transferred $37,868.77 from this account to Rhonda Reimer.[7]

According to Debtor, he originally planned to transfer $75,000 to Rhonda Reimer. Debtor testified that he understood that he and Rhonda Reimer owned all of their assets

---

[5] When asked if he made any other transfers to Rhonda Reimer within the two years before he filed for bankruptcy, Debtor testified "Sure, I made several transfers, I just don't recall any right now. But, you know, when you are married, you have a joint checking account and things happen."  Debtor admitted that the $6,500 transfer was the only transfer he listed on his original schedules.

[6] The balance of Debtor's account with Bank Forward just prior to the $148,633.77 deposit was $0.00.  See T-9.

[7] Reimer described this $37,868.77 transfer on his Statement of Financial Affairs as "Sale proceeds from Legendary Cycles."  D-103 at 23.

equally, based on conversations with his personal attorney.  While acknowledging his understanding did not arise from a formal legal opinion, Debtor claims he believed Rhonda Reimer owned half of everything he owned.[8]  Accordingly, he maintains that Rhonda Reimer was entitled to half of the $148,622.77 in proceeds from the sale of Legendary's property even though there is no documentation suggesting that Rhonda Reimer owned an interest in Legendary.  Although he planned to transfer $75,000 of this sum to Rhonda Reimer, he paid a bill with part of these proceeds and transferred the remaining sum ($37,868.77) to her.

Debtor did not list the $37,868.77 transfer to Rhonda Reimer on his original bankruptcy schedules.  See T-1.  He listed this transfer on his amended schedules filed on February 4, 2019.  D-103.

### 4.    Transfer or Dissipation of $35,765 on August 2, 2018

On August 2, 2018, Debtor withdrew $35,765 from a Bank Forward savings account in his name only.  T-9.  The Trustee asked about this transfer in written discovery, but Debtor failed to provide an explanation before trial.  T-13.  At trial, Debtor claimed records showing the disposition of this money would be easy to produce, yet he declined to disclose the information.  Debtor surmised that this withdrawal was for "taxes due or something on Legendary that we had to pay back. I am not positive about

---

[8] Debtor acknowledged that his "understanding" about equal ownership in property owned by a spouse applied to Rhonda Reimer's property as well, yet he did not list his half interest in Allrail on his bankruptcy schedules.  When asked why he did not list his interest in his wife's property on his bankruptcy schedules, Debtor responded, "For the same reason I didn't list Rhonda on any of the things. It was something she did and the things that I did, I did."  According to Reimer, he did not list Rhonda Reimer as having a half interest in Blue Sky or R & R because "that's the way the paperwork was drawn up."

that. That might have been what I put in my wife's account. I can't remember exact numbers right now."

Debtor did not disclose this $35,765 withdrawal on his schedules.  His failure to explain the disposition of this withdrawal is the subject of the Trustee's motion to amend his Complaint.

### 5.    Transfer of $50,000 to Rhonda Reimer on December 11, 2018

On December 11, 2018, ten days before he filed his bankruptcy petition, Debtor transferred $50,000 from a Raymond James investment account in his name to Rhonda Reimer.[9]  See T-5.  Debtor explained he transferred this $50,000 to pay his share of the down payment on the house where Rhonda Reimer and Debtor currently live. Debtor transferred the money to Rhonda Reimer's account intending that she would, in turn, use it for the down payment on their home.  Debtor did not disclose this transfer on his original schedules, the amended schedules filed February 4, 2019, or the amended schedules filed March 20, 2019.

### 6.    Transfer of an interest in a 1966 Chevrolet Chevelle to Rhonda Reimer by adding her name to the title

In gathering documents to support his bankruptcy schedules, Debtor searched but could not find a certificate of title for his 1966 Chevrolet Chevelle.  Consequently, Debtor requested a duplicate title from the Department of Motor Vehicles.  When a DMV employee asked who owned the vehicle, Debtor responded that he and Rhonda Reimer

---

[9] In his original schedules, Debtor listed this account as valued at $15,705.13.  T-1 at 10.  Debtor did not exempt this account.  According to a Raymond James Account Summary, dated November 30 to December 21, 2018, Debtor's portfolio totaled $13,596.09.  T-5 at 5.  The account statements show $938.34 remained in the account as of December 31, 2018.

owned it.  Accordingly, the duplicate title dated October 23, 2018, listed both of their names as owners.  Debtor did not know if Rhonda Reimer was listed on the original title.[10]

Debtor did not disclose that Rhonda Reimer owned an interest in the Chevelle on his original schedules.  See T-1.  On his amended schedules filed February 4, 2019, Debtor disclosed that only he owned an interest in the Chevelle on Schedule B, but he acknowledged that he added his spouse to the title of this vehicle in his Statement of Financial Affairs.  D-103 at 6, 23.

### D.    Initially Omitted Assets

Debtor omitted several assets on his original schedules.  He disclosed many of these assets on his amended schedules, however.

#### 1.    Two boat lifts and a dock

Debtor did not disclose two boat lifts and a dock on his original bankruptcy petition.  See T-1.  He disclosed them on his amended schedules filed March 20, 2019, valuing them at $5,000.  D-104.

#### 2.    A tamper or a $24,000 account receivable from Allrail

---

[10] Debtor argues that "it was [Debtor's] recollection that [Debtor and Rhonda Reimer] were both owners of the vehicle on the original title."  Doc. 111 at 6.  This argument is inconsistent with the record:

| | |
|---|---|
| Counsel: | Did you transfer an interest in that to her? |
| Debtor: | You know, I don't recall if I transferred it or if it was always there. |
| | . . . |
| Counsel: | Ok. So do you know if she was listed on the title before you got that duplicate title? |
| Debtor: | I do not know that. |

Trial Test. at 2:17-2:18.

Several years ago, Debtor learned from Allrail's President, Reed Reimer, that Allrail would need a tamper[11] if it received certain railroad maintenance contracts. Although no one at Allrail asked Debtor to buy a tamper, Debtor (on behalf of R & R) purchased a tamper at an auction for $24,000 with R & R funds. Debtor reimbursed R & R for the purchase of the tamper on April 5, 2018, purportedly anticipating that Allrail would win a contract in the Chicago area and purchase the tamper from him. See T-7. Allrail did not receive a contract requiring the use of a tamper. According to Debtor, he sent Allrail an invoice for the tamper, but Allrail did not pay it. Conversely, Rhonda Reimer testified that Allrail did not take possession of the tamper, Debtor never sent Allrail an invoice for the tamper and Allrail does not owe money to Debtor for the tamper.

Debtor estimates the current value of the tamper is between $40,000-$50,000. At the time of trial, the tamper was in Grand Forks, and Debtor testified that he was willing to give it to the Trustee.

Debtor did not disclose the tamper or a $24,000 account receivable from Allrail on his original bankruptcy schedules.[12] See T-1. Likewise, he did not disclose that he owned a tamper on his amended schedules. However, he disclosed the $24,000

---

[11] A tamper is a piece of equipment used in railroad maintenance that raises the track and aligns it.

[12] Debtor explained that, when he filed his petition, he thought Allrail owned the tamper. On his original schedules, Debtor did not list an account receivable from Allrail because he "didn't even think about it." At the meeting of creditors, Debtor testified that Allrail owned the tamper. At trial, Debtor testified that Allrail does not own the tamper because it did not pay him.

"[o]wed by Allrail Services, LLC for purchase of a tamper at auction" on his amended

schedules filed March 20, 2019.  D-104.

### E.    Disputed Asset Values

The Trustee hired Robert Helbling Jr. in December 2018 to provide value

estimates for several of Debtor's assets.  In March 2019, Helbling conducted an

appraisal, relying on internet research and phone calls to arrive at his valuations.[13]  See

T-28.

Relying on Helbling's estimates and other information, the Trustee alleges Debtor

undervalued numerous assets in his bankruptcy schedules.  The following table

summarizes the parties' different value estimates for the assets at issue:

| Asset | Debtor Value | Basis for Debtor Value | Trustee Value | Basis for Trustee Value | Sale Price |
|---|---|---|---|---|---|
| 2003 Harley Davidson motorcycle | $4,500 | Ownership of motorcycle store; older motorcycle, Debtor assumed "value wouldn't be there." | $9,500 | Helbling Appraisal Report (T-28); discussion with motorcycle dealers. | $5,890 |

[13] At trial, both parties called witnesses who testified about the imprecision of accurately valuing assets.  Robert Helbling Jr., an auctioneer with over 35 years of experience, testified that valuation is never exact and that his estimates of fair market value are only "spot on" about ten percent of the time.  Bruce Madlom, a bankruptcy attorney and expert, testified that in-person asset value estimates are more accurate than generic valuations based on internet sources and comparisons, but both are imprecise.  He opined that no one really knows the market value of property until it is sold.

| 2017 Indian Chieftain Elite motorcycle | $14,000 | Ownership of motorcycle store; received $14,000 for trade of other motorcycle and "assumed this would be worth the same." | $21,000 | Helbling Appraisal Report (T-28); discussion with motorcycle dealers. | $22,900 |
|---|---|---|---|---|---|
| 1966 Chevrolet Chevelle SS | $15,000 | No information provided. | $18,000 | Helbling Appraisal Report (T-28); discussion with friend who is "big into old cars." | $18,000 |
| 2000 Jeep Wrangler Sport | $5,200 | Bought approximately ten years ago for $10,000; thought "worth hardly anything." | $8,000 | Helbling Appraisal Report (T-28); two recent dealer sales in Moorhead, MN. | $11,450 |
| 2012 Centurion Enzo boat | $22,000 | Discussions with employees at U-Motors, Fargo ND. | $51,000 | Helbling Appraisal Report (T-28); discussions with employees of Willey's Marine Inc. in McGregor, MN. | $46,100 |
| 2012 Premier pontoon | $15,000 | Discussions with employees at U-Motors, Fargo ND. | $61,000 | Helbling Appraisal Report (T-28); discussions with employees of Willey's Marine, Inc. | $36,850 |
| Property at 2731 Norway Bluff SE, Bemidji | $557,400 | Tax value from tax statement provided by county. | $795,000 or $804,500 | Appraisal on 7/26/16 for $795,000 (T-2) and Appraisal on 11/05/20 for $804,500 (T-3). | N/A |

### F.    1963 Chevrolet Corvette Stingray

Debtor and Richard Woodward have known each other for many years.  Debtor

testified that he talks to Woodward nearly every day.  According to Debtor, Woodward

13

bought a 1963 Chevrolet Corvette Stingray to "help out" his sister, who was going

through a divorce several years ago.  Woodward stored the Corvette in his garage for a

couple years after he bought it.  At some point, Woodward told Reimer he wanted to

"get rid of the Corvette."  Woodward's daughter needed a truck, so Woodward asked

Debtor if he had a truck to trade.  Debtor owned an Escalade truck, but it was not worth

as much as the Corvette.  Debtor explained, "That's when we made the decision that

when the [Corvette] was sold, [Woodward] would get 50% of the proceeds."  Debtor

testified that he and Woodward did not memorialize their agreement in writing, in part

because Debtor has "always been a handshake kind of guy."

In 2016, Debtor took possession of the Corvette.  Debtor only drove the Corvette

about 10 miles every year and mostly kept it in storage.  Debtor typically stored the

Corvette at a storage facility in Grand Forks, the garage at his house in Grand Forks or

his lake home near Bemidji.

When Debtor filed his bankruptcy petition in December 2018, the Corvette was at

the storage facility in Grand Forks.  Debtor listed the Corvette on his initial schedules,

valuing it at $40,000 and claiming he and Woodward each owned a half interest.  T-1.

Debtor did not exempt his interest in the Corvette.  According to Debtor, he possessed

the title to the Corvette—which was in Woodward's name—both when he filed his

bankruptcy petition and at the time of the meeting of creditors in February 2019.

Debtor sent the original title back to Woodward <u>after</u> the meeting of creditors.  He

testified that he sent Woodward the Corvette's title because it "did me no good and I

had to send it back to him to get him to sign off no matter what happened so he would

have had to have it at some point in time."  Debtor admitted, however, that he did not

expect Woodward to sign the title or return it to him.  Debtor never requested Woodward to return the title to him.  Debtor explained that if he had wanted to sell the Corvette, he would have called Woodward and asked him to send the title to the buyer.

At trial, Debtor testified he never had possession of the Corvette.  He explained, "In my opinion, possession means in this particular case that I would have the title in my possession with my name on it and I would have the car in my garage."  To satisfy his definition of possession, Debtor would need a "signed title or at least a title with my name on it."  Debtor "never said that I don't have [the Corvette] in my garage or in storage. The only thing is, I never had the title to it. The signed off title that said I was able to take that car and sell it and consummate that deal."  He conceded, however, that he possessed the keys and could have "accessed that vehicle at any time. So could Richard."

In administering bankruptcy estate assets, the Trustee sought to gain possession and sell the Corvette.  With Court permission, the Trustee retained the services of Helbling to assist with asset sales.  Helbling inspected the Corvette in March 2019 and estimated its value at $42,000.  T-19.

During the spring of 2019, the Trustee and Debtor communicated about Debtor's interest in buying the bankruptcy estate's interest in several assets, including the Corvette.  In a letter dated May 10, 2019, the Trustee outlined their tentative agreement regarding Debtor's intent to purchase the estate's interest in several assets.  In this letter, the Trustee also sought to make arrangements to obtain the Corvette and four other assets the bankruptcy estate intended to sell.  T-23.

15

In a letter dated May 17, 2019, from Debtor's attorney to the Trustee, Debtor represented that, "The Corvette is not titled in Debtor's name, nor is it in his physical possession."  T-25.  When asked at trial if this was a true statement at the time it was made, Reimer responded, "I would assume that to be true that day because I had it in storage so it was not in my possession in my opinion."

In July 2019, the Trustee filed a Motion for Turnover, seeking an order requiring Debtor to turn over the Corvette and other nonexempt assets.  At trial, Debtor testified that he drove the Corvette from Grand Forks to his lake home in August 2019. According to interrogatory answers Debtor signed on March 13, 2020, the Corvette has been at the lake home since "approximately October 2019."  T-13.

The Court held a hearing on the Trustee's motion on November 5, 2019, which Debtor attended.  On at least two separate occasions during the hearing, Debtor's attorney represented that Debtor did not have possession of the Corvette.[14]  At the time of this hearing, Debtor knew the Corvette was stored in his garage at the lake.  When the Trustee asked Debtor at trial whether Attorney Brakke's statements from the hearing were accurate at the time, Debtor responded, "It goes back to having the title and the car in your garage."

Because Debtor represented (through counsel) that he did not have possession of the Corvette and because the Court received no evidence to the contrary, it did not

---

[14] At the hearing on the Motion for Turnover, Attorney Jon Brakke represented, "[A]s far as the Corvette, we don't have possession of it, Your Honor.  The Trustee can go get it from the person that owns it, if he can."  Later in the hearing, Attorney Brakke also said, "And as to the Corvette, we don't have possession, we don't have title." Attorney Brakke testified at trial that he "would not have made [those statements] unless I believed them to be true."

order Debtor to turn over the vehicle.  Rather, it ordered Debtor to "relinquish his

interest in two boat lifts and a 1963 Chevrolet Corvette Stingray (VIN#206) and

cooperate with the Trustee in his efforts to gain possession of these items."  T-39.

Debtor testified that he turned over the items "I felt I had possession of. But I didn't feel

that I had the ability to turnover the Corvette because I did not have the title. I would not

have withheld it. If Richard had told me to relinquish that Corvette at that time, I would

have."

After receiving Debtor's discovery answers disclosing that Debtor stored the

Corvette at his lake home, the Trustee asked Helbling to obtain the vehicle and make

arrangements to sell it.  On March 12, 2020, Helbling asked Debtor about the location of

the Corvette.  Debtor told Helbling, "You're too late, it's gone. Rick Woodward has

picked it up. He took it last week or maybe it was this week I really can't remember."

According to Reimer, he made this statement to Helbling because he "assumed it was

going to happen or had happened."[15]  At this time, Debtor and Woodward spoke three

or four times a week, yet Woodward never told Debtor that he had obtained the

Corvette.  At trial, Debtor conceded that, if Woodward took the Corvette, he would have

mentioned this fact to Debtor during one of their frequent conversations.  On the date

Debtor told Helbling that Woodward had picked up the Corvette, the Corvette was still

located in Debtor's garage at the lake.

---

[15] Debtor testified that his attorney told him that Woodward could come and get
the Corvette and that he "was under the assumption [Woodward] was going to do that."
According to Debtor, he had a conversation with Woodward about transferring
possession of the Corvette in the winter of 2019-2020.

Debtor stored the Corvette at his lake home from August 2019 until March 27, 2020, when Helbling picked it up at the Trustee's request.  Helbling testified Debtor was "very helpful" that day.  When the Trustee asked Debtor what changed between March 12 and March 27, Debtor responded, "At that time I knew that [Woodward] had not picked up the Corvette and I wanted to make sure that this thing got done.  I told [Woodward] that I was going to let [Helbling] take it and he said okay."  Debtor testified he was concerned with protecting Woodward's interest because "Rick Woodward is a personal friend of mine.  We have been doing business together for many years.  I'd say probably 20 years.  We have done a lot of things together.  When you have a friend, you try to protect his assets."  Helbling sold the 1963 Chevrolet Corvette Stingray at auction for $45,200.  Doc. 100.

## II.    CONCLUSIONS OF LAW

### A.    11 U.S.C. § 727(a)

In his Complaint, the Trustee seeks a denial of Debtor's discharge under 11 U.S.C. § 727(a)(2), (4) and (6).  Section 727(a) of the Bankruptcy Code provides, in relevant part, that the court shall grant a debtor a discharge unless:

> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under [the Bankruptcy Code], has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
>
> > (A) property of the debtor, within one year before the date of the filing of the petition; or
> >
> > (B) property of the estate, after the date of the filing of the petition;
>
> * * *
>
> (4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account;

* * *

(6) the debtor has refused, in the case—

(A) to obey any lawful order of the court, other than an order to respond to a material question or testify[.]

11 U.S.C. § 727(a). Denying a debtor a discharge is a harsh remedy. <u>Home Serv. Oil Co. v. Cecil</u> (<u>In re Cecil</u>), 542 B.R. 447, 451 (B.A.P. 8th Cir. 2015) (citation omitted). Therefore, courts construe section 727 strictly in favor of the debtor. <u>Id.</u> Notwithstanding, a discharge in bankruptcy and the associated fresh start are privileges, not rights. <u>Bauer v. Iannacone</u> (<u>In re Bauer</u>), 298 B.R. 353, 357 (B.A.P. 8th Cir. 2003) (citing <u>Grogan v. Garner</u>, 498 U.S. 279, 286 (1991)). "The opportunity for a completely unencumbered new beginning is limited to the honest but unfortunate debtor." <u>Id.</u> The cost to the debtor for an unencumbered fresh start is minimal, but it includes honestly and accurately disclosing his or her financial affairs and cooperating with the trustee. <u>Id.</u>; <u>see also</u> 11 U.S.C. § 521 (listing a debtor's duties in bankruptcy). "To prevail in an action to deny a debtor's discharge, the objecting party must prove each element under § 727 by a preponderance of the evidence." <u>Kaler v. Charles</u> (<u>In re Charles</u>), 474 B.R. 680, 683-84 (B.A.P. 8th Cir. 2012) (citing <u>Allred v. Vilhauer</u> (<u>In re Vilhauer</u>), 458 B.R. 511, 514 (B.A.P. 8th Cir. 2011)). To meet this standard, the movant must show the existence of a fact is more probable than its nonexistence. <u>Northland Nat'l Bank v. Lindsey</u> (<u>In re Lindsey</u>), 443 B.R. 808, 812 (B.A.P. 8th Cir. 2011).

## 1.    727(a)(2)(A)

To prevail under section 727(a)(2)(A), the Trustee must prove by a preponderance of the evidence: (1) Debtor's actions took place within one year before

19

the petition date; (2) the act was that of Debtor; (3) Debtor transferred, removed, destroyed, mutilated or concealed property; and (4) Debtor took these acts with an intent to hinder, delay or defraud a creditor or the Trustee.  See Georgen-Running v. Grimlie (In re Grimlie), 439 B.R. 710, 716 n.11 (B.A.P. 8th Cir. 2010); Kaler v. Huynh (In re Huynh), 392 B.R. 802, 810 (Bankr. D.N.D. 2008).  "'Once a gratuitous transfer is shown, the burden then shifts to the debtor to prove his intent was not to hinder, delay, or defraud his creditors.'" Cadlerock Joint Venture II, L.P. v. Sandiford (In re Sandiford), 394 B.R. 487, 490 (B.A.P. 8th Cir. 2008) (quoting The Abbott Bank-Hemingford v. Armstrong (In re Armstrong), 931 F.2d 1233, 1239 (8th Cir. 1991)).

> **a.    The Trustee met his burden of showing that Debtor transferred or concealed property within one year before the petition date.**

The Trustee offered evidence showing that Debtor transferred $2,000 to his son within one year before the petition date.  Debtor also transferred cash to his wife, Rhonda Reimer, within one year before the petition date as follows:  $37,868.77 on August 2, 2018; $6,500 on June 4, 2018; and $50,000 from his Raymond James account on December 11, 2018.

With the exception of the $50,000 transfer from Debtor's investment account to Rhonda Reimer's bank account, Debtor does not dispute the Trustee satisfied the first three elements of his section 727(a)(2)(A) cause of action with respect to the monetary transfers listed above.  Debtor argues that the $50,000 payment to Rhonda Reimer from Debtor's Raymond James account is not a transfer under section 727(a)(2)(A).  He requests the Court apply the "mere conduit doctrine" and find that Rhonda Reimer is an intermediate funds receiver from whom recovery may not be sought under section

727(a)(2)(A).  Doc. 111 at 8.  In support of this theory, Debtor maintains he transferred $50,000 with the understanding that Rhonda Reimer would, in turn, transfer it to a third party for the purchase of their residence.  Debtor suggests that Rhonda Reimer did not have dominion or control over the transferred property; she was a mere conduit who cannot or should not be deemed a transferee under this statute.

Under the mere conduit doctrine, if "the conduit did not have dominion or control over the transferred property" then it "cannot or should not be deemed a 'transferee.'" McCord v. Ally Fin., Inc., (In re USA United Fleet, Inc.), 559 B.R. 41, 64 (Bankr. E.D.N.Y. 2016).  Typically, "the entity asserting the defense often is a financial intermediary, such as a financial institution or broker, in the role of facilitating a payment from one entity (such as the debtor) to another (such as a creditor).  By asserting this doctrine as a defense to a preference or fraudulent transfer claim, the defendant states that recovery may not be had from it, because it 'is not an initial transferee if it was a "mere conduit" of the funds.'"  Id.[16]

The Court is not convinced that Rhonda Reimer was a "mere conduit" under the circumstances of this case.  There is no evidence that she was a trustee holding funds

---

[16] See also § 9:56.Liability of transferees of an avoided transfer—Transferees who may be liable in recovery action, 2 Bankruptcy Law Manual § 9:56 (5th ed.) ("Parties such as banks and attorneys are often considered mere conduits since they simply hold funds for the benefit of third parties." "[C]ourts have carved out an equitable exception, adopting . . . the 'mere conduit' test in determining whether an agent of a debtor is a mere conduit and not a transferee who can be held liable in a recovery action."); 5 Collier on Bankruptcy ¶ 550.02 (16th 2020) ("In order for a court to ignore the literal meaning of section 550(a)(1) on equitable grounds and treat a recipient of property from a debtor as a 'mere conduit' rather than an 'initial transferee,' the recipient must have acted in good faith. In some circumstances, where a literal application of section 550(a) would permit the trustee to recover from a party who acted merely as a conduit, the bankruptcy court should use its equitable powers to prevent an inequitable result." (citing cases)).

on behalf of Debtor or other transferee who should not, in equity, be deemed a
transferee.  Rather, Debtor relinquished possession and control over the $50,000 when
he transferred it to Rhonda Reimer.  Rhonda Reimer, in turn, exercised dominion and
control over the $50,000 when she reportedly spent it on a down payment for a house
where she and Debtor currently reside.  See In re Butler, 377 B.R. 895, 917-18 (Bankr.
D. Utah 2006) ("Essentially, a 'transfer' is any disposition of an interest in property which
includes a transfer of possession, custody, or control even if there is no transfer of title
and which also includes deposits to, withdrawals from, and transfers between bank
accounts or similar accounts."); James v. Tipler (In re Tipler), 360 B.R. 333, 341 (Bankr.
N.D. Fla. 2005) (finding a deposit by debtor into a joint account with his wife was a
transfer).  To the extent Debtor maintains that he retained control over the $50,000 after
he transferred it to his wife and directed her how to spend the funds, Rhonda Reimer's
transfer of the funds to pay for the residence in compliance with his instructions qualifies
as a second transfer.  See Doeling v. Gapp (In re Gapp), 604 B.R. 371, 384 (Bankr.
D.N.D. 2019) (finding a second transfer "to the extent that Debtor retained control or
influence over how Roxanne spent the money in her account").  Accordingly, the Court
finds that Debtor's transfer of $50,000 to Rhonda Reimer's account constitutes a
transfer under 727(a)(2).  See id.  The Trustee met his burden of showing the first three
elements of his claim with respect to the $50,000 transfer.

The evidence also shows that Debtor transferred an interest in the 1966
Chevrolet Chevelle to his wife in October 2018 by adding her name to the title.  Debtor
testified that he did not know if the original title to this vehicle listed Rhonda Reimer as
an owner, but when he requested a duplicate title from the Department of Motor

Vehicles, he represented that she owned an interest in the vehicle.  His initial and amended Schedule B show he is the sole owner of the Chevelle, but he disclosed that he added her name to the title.  Debtor's addition of Rhonda Reimer's name to the Chevelle title in October 2018 qualifies as the transfer of an interest in property within one year of the petition under section 727(a)(2)(A), satisfying the first three elements of this claim.

Additionally, Debtor concealed his interest in the tamper he purportedly purchased for Allrail in April 2018.  Although Debtor claims he purchased the tamper for Allrail and suggested that he transferred it to Allrail, creating an accounts receivable, the Court is not convinced that Debtor transferred the tamper to Allrail.  No one at Allrail asked Debtor to purchase the tamper.  Rhonda Reimer testified that Allrail did not take possession of the tamper, Debtor never sent Allrail an invoice for the tamper and Allrail does not owe money to Debtor for the tamper.  The Court does not find Debtor's testimony about the purported transfer of the tamper to Allrail, the accounts receivable arising from this alleged transfer or the creation and delivery of invoices to Allrail credible.  The Trustee met his burden of showing Debtor concealed his ownership of the tamper he purchased within one year of the petition date.

Accordingly, the Court finds that the Trustee met his burden of proving the first three elements of his section 727(a)(2)(A) with respect to the property described above.

> **b.     The Trustee met his burden of showing that Debtor transferred or concealed property with intent to hinder, delay or defraud a creditor or an officer of the estate.**

Because a debtor rarely admits to fraudulent intent, a party seeking denial of discharge must generally rely on a combination of circumstances, or "badges of fraud,"

that suggest the debtor harbored the necessary intent.  Ritchie Cap. Mgmt., LLC v. Stoebner, 779 F.3d 857, 861 (8th Cir. 2015); Stoebner v. Ritchie Cap. Mgmt., L.L.C. (In re Polaroid Corp.), 472 B.R. 22, 55-56 (Bankr. D. Minn. 2012); In re Huynh, 392 B.R. at 810.  The Eighth Circuit Court of Appeals has looked to the "badges of fraud" for help in determining actual intent "'regardless of whether the intent language came from a state fraudulent transfer statute or applicable bankruptcy law.'"  Ritchie, 779 F.3d at 861 (citations omitted).

Under North Dakota law, the "badges of fraud" or factors include:

a.  The transfer or obligation was to an insider;

b.  The debtor retained possession or control of the property transferred after the transfer;

c.  The transfer or obligation was disclosed or concealed;

d.  Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

e.  The transfer was of substantially all the debtor's assets;

f.  The debtor absconded;

g.  The debtor removed or concealed assets;

h.  The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

i.  The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

j.  The transfer occurred shortly before or shortly after a substantial debt was incurred; and

k.  The debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor.

N.D.C.C. § 13-02.1-04.  This list is similar to those cited in bankruptcy cases.  See, e.g.,

Helena Chem. Co. v. Richmond (In re Richmond), 429 B.R. 263, 305 (Bankr. E.D.

Ark.2010); Doeling v. O'Neill (In re O'Neill), 550 B.R. 482, 500 (Bankr. D.N.D. 2016); In

re Huynh, 392 B.R. at 810.[17]  These lists are not exhaustive, and courts are free to

consider "any factors they deem relevant to the issue of fraudulent intent."  Ritchie, 779

F.3d at 863 (in the context of a fraudulent transfer action under 11 U.S.C. §

548(a)(1)(A))[18] (quoting Jensen v. Dietz (In re Sholdan), 217 F.3d 1006, 1009–10 (8th

Cir. 2000)); Dunker v. Bachman (In re Bachman), 2017 WL 3098093, at * 4 (Bankr. D.

Neb. July 20, 2017).

---

[17] The "badges of fraud" cited in In re Huynh are:  "(1) lack or inadequacy of consideration; (2) family, friendship or other close relationship between the transferor and transferee; (3) retention of possession, benefit or use of the property in question; (4) financial condition of the transferor prior to and after the transaction; (5) conveyance of all of the debtor's property; (6) secrecy of the conveyance; (7) existence of trust or trust relationship; (8) existence or cumulative effect of pattern or series of transactions or course of conduct after the pendency or threat of suit; (9) instrument affecting the transfer suspiciously states it is bona fide; (10) debtor makes voluntary gift to family member; and (11) general chronology of events and transactions under inquiry."  Kaler v. Huynh (In re Huynh), 392 B.R. 802, 810 (Bankr. D.N.D. 2008).

[18] Recognizing the nearly identical wording of Code sections 522(o), 548(a)(1)(A) and 727(a)(2), the Eighth Circuit Court of Appeals and numerous bankruptcy courts apply the same standard of "intent to hinder, delay or defraud" a creditor to cases under these sections.  See Addison v. Seaver (In re Addison), 540 F.3d 805, 811-12 (8th Cir. 2008); In re Sholdan, 218 B.R. 475, 481 (Bankr. D. Minn.1998), aff'd 217 F.3d 1006 (8th Cir. 2000) (citing cases) ("The Eighth Circuit has approved the use of the same inferential process in applying the statutory language 'with intent to hinder, delay or defraud creditors,' wherever that language is found—in state fraudulent-transfer statutes, 11 U.S.C. § 548(a), or 11 U.S.C. § 727(a)(2)").  This standard includes the badges of fraud analysis.  In re Addison, 540 F.3d at 811-12; Dantzler v. Zulpo (In re Zulpo), 592 B.R. 231, 247 (Bankr. E.D. Ark. 2018) ("Courts have applied the inferential 'badges of fraud' approach to determine whether a debtor acted with fraudulent intent, regardless of which of these provisions is being construed.").

The presence of a single badge is typically not sufficient to establish actual fraudulent intent.  Brown v. Third Nat'l Bank (In re Sherman), 67 F.3d 1348, 1354 (8th Cir. 1995).  The confluence of several badges, however, creates a presumption of fraudulent intent.  Ritchie, 779 F.3d at 861-62; Kelly v. Armstrong, 141 F.3d 799, 802 (8th Cir. 1998); Dantzler v. Zulpo (In re Zulpo), 592 B.R. 231, 247 (Bankr. E.D. Ark. 2018); see also Rademacher v. Rademacher (In re Rademacher), 549 B.R. 889, 894 (Bankr. E.D. Mo. 2016) (noting that the presence of more than one badge of fraud "strongly indicates that the debtor did, in fact, possess the requisite intent.").

Debtor argues that the "Trustee has wholly failed to carry his evidentiary burden to prove to this Court that Reimer's acts were done with actual intent to hinder, delay or defraud a creditor."  Doc. 111 at 4.  The Court disagrees.

In 2015, R & R suffered financial setbacks that eventually led Debtor to close the business during the summer of 2018.  R & R's financial difficulties forced Debtor to liquidate the assets of one or more of his businesses in 2018, including Blue Sky in July 2018.  At the same time, Legendary closed, causing Debtor to lose several hundred thousand dollars.  Debtor testified that his personal liability for business debt resulting from guaranties led to his decision to petition for bankruptcy relief.  Debtor's original bankruptcy schedules show that he owed more than $12.7 million to dozens of business and personal creditors in December 2018.

The general chronology of events and Debtor's transactions just before he petitioned for bankruptcy relief suggest Debtor intended to hinder, delay or defraud his creditors by transferring assets to his wife, concealing them or dissipating them.

April 5, 2018        Debtor purchased a tamper from R & R or reimbursed
                     R & R for a tamper

26

| May 2018 | Debtor received his last check from R & R |
|---|---|
| Summer 2018 | Debtor closed R & R |
| June 4, 2018 | Debtor transferred $6,500 to Rhonda Reimer "to fund her retirement" |
| Late July 2018 | Legendary Closed |
| | Debtor transferred $148,633.77 in sale proceeds from Legendary to Blue Sky |
| August 1, 2018 | Debtor transferred $148,633.77 from Blue Sky to Debtor |
| August 2, 2018 | Debtor transferred $37,868.77 from Debtor to Rhonda Reimer |
| August 2, 2018 | Debtor transferred or dissipated $35,765 (no explanation provided) |
| October 23, 2018 | Debtor added Rhonda Reimer's name to 1966 Chevrolet Chevelle title |
| December 11, 2018 | Debtor transferred $50,000 to Rhonda Reimer, but did not disclose this transfer |
| December 21, 2018 | Debtor petitioned for bankruptcy relief |

As the timeline shows, within weeks or months after he closed several of the

businesses in which he held an interest and just before he filed his bankruptcy petition,

Debtor transferred cash and other property to his wife. He also withdrew over $35,000

but provided no explanation of the disposition of this cash. Despite extreme financial

difficulty at this time, he also purchased a tamper for $24,000 that he never disclosed on

his bankruptcy schedules[19] and transferred $50,000 from an investment account (which

---

[19] Debtor disclosed an account receivable from Allrail for the purchase of a tamper on his schedules amended March 20, 2019. This disclosure mischaracterizes the nature of his interest and does not negate the fact that he failed to disclose that he purchased the tamper several months before he filed his bankruptcy petition and owned

he did not exempt) to his wife, reportedly for the purchase of their residence that he also failed to disclose.

The monetary transfers to his wife included proceeds from the sale of failed businesses in which Debtor held an interest.  He transferred these business liquidation proceeds to his wife, despite the fact there is no evidence that she held an interest in these businesses or assumed liability for debt arising from these businesses.  The transfer of the sale proceeds, like the other transfers to his wife, was entirely gratuitous.

Debtor claimed that he transferred money and property to his wife, including proceeds from the sale of business assets, because she was entitled to half of his assets.  Specifically, he testified that he understood that he and Rhonda Reimer owned all of their assets equally based on conversations with his personal attorney.  While acknowledging his understanding did not arise from a formal legal opinion, Debtor claims he believed his wife owned half of everything he owned.  The Court finds this testimony self-serving and unconvincing.  Debtor applied his theory or "understanding" regarding shared assets selectively and illogically.  Although claiming his wife owns half of his assets, Debtor did not list Rhonda Reimer as a co-owner of Legendary, R & R or Blue Sky on his schedules.  He conceded that, based on his understanding, he shares an interest in his wife's assets, but he claimed no interest in Allrail on his petition.  He understood that she was entitled to half an interest in his vehicles, yet he did not add

_____

it on the petition date.  See U.S. Tr. V. Pourmehdi (In re Pourmehdi), 2015 WL 13776208, at *6 (Bankr. W.D. Ark. Mar. 10, 2015) (when analyzing intent under section 727(a)(2)(B), "[a]mendments filed after the falsity of the original documents is revealed do not negate the fact that the original schedules and statements were inaccurate." (citing Sholdra v. Chilmark Fin. LLP (In re Sholdra), 249 F.3d 380, 382-83 (5th Cir. 2001))).

her name to the 1966 Chevrolet Chevelle title until after R & R (his primary business)

began to fail.  He claims his wife was entitled to half the proceeds from the liquidation of

Legendary assets, yet she holds no interest in the corporation and shares no liability for

its debts.  After he received the proceeds from the sale of Legendary property, Debtor

did not split the proceeds equally and pay half to Rhonda Reimer.  Rather, he paid her

only $37,868.77 of the $74,311.38 he claims she was entitled to receive, unilaterally

deciding that a creditor he selected should receive part of these proceeds.  This conduct

is not consistent with his purported "understanding."

Debtor's other justifications for transferring assets to his wife also lack credibility

and create an inference that he was transferring or dissipating assets to benefit his

family or to fund his wife's retirement rather than pay creditors.  When the Trustee

asked Debtor if there was a "reason you were transferring thousands of dollars to your

wife when your source of income was drying up," Debtor responded: "I didn't think about

why I was doing it, I just did it. I mean, it's just what you do, transfer money back and

forth for retirement."  This explanation for his asset transfers to his wife does not negate

intent to defraud creditors, it supports it. [20]

Accordingly, the Trustee met his burden of showing that Debtor transferred and

concealed assets with intent to hinder, delay and defraud creditors under section

727(a)(2)(A).  See In re Rademacher, 549 B.R. at 894 (noting that the presence of more

---

[20] "'Once a gratuitous transfer is shown, the burden then shifts to the debtor to
prove his intent was not to hinder, delay, or defraud his creditors.'" Cadlerock Joint
Venture II, L.P. v. Sandiford (In re Sandiford), 394 B.R. 487, 490 (B.A.P. 8th Cir. 2008)
(quoting The Abbott Bank-Hemingford v. Armstrong (In re Armstrong), 931 F.2d 1233,
1239 (8th Cir. 1991)).  Debtor failed to meet his burden.

than one badge of fraud "strongly indicates that the debtor did, in fact, possess the requisite intent.").

### 2.    727(a)(2)(B)

The Trustee also seeks an order denying Debtor a discharge under section 727(a)(2)(B).  To prevail under section 727(a)(2)(B), the Trustee must prove:

> (1) the act serving as the basis for the claim took place . . . after the petition for relief (subsection B);
>
> (2) the act was that of Debtor;
>
> (3) the act amounted to a transfer, removal, destruction, mutilation or concealment of property of the bankruptcy estate; and
>
> (4) the act was done with an intent to hinder, delay, or defraud a creditor or the trustee.

Wilson v. Walker (In re Walker), 515 B.R. 725, 750 (Bankr. W.D. Mo. 2014), aff'd, 528 B.R. 418 (B.A.P. 8th Cir. 2015) (footnote omitted) (citing Kaler v. Hentz, (In re Hentz), 2013 WL 1197616 at *8 (Bankr. D.N.D. March 24, 2013)).  The elements of proof under paragraphs (A) and (B) are "virtually the same, differing only in the requisite timing of the debtor's acts and the nature of the property involved."  Id.

The Trustee argues that Debtor's "entire course of dealings relating to the Corvette indicate attempts at concealment of the Corvette from the trustee after the date he filed bankruptcy."  Doc. 110 at 8.  Specifically, the Trustee argues that there were "numerous false misrepresentations" made to the Trustee via Debtor's attorney, asserting that Debtor "did not have possession of the Corvette."  Id. at 8-9.  The Trustee further argues that, after Debtor disclosed he had possession of the Corvette in his discovery answers, he made "further efforts to mislead and frustrate the trustee from taking possession of it by representing to Mr. Helbling on March 12, 2020, that the

Corvette was no longer in his possession." Id. at 9.  The Trustee maintains evidence

offered at trial satisfies his burden of proof under section 727(a)(2)(B) justifying denial of

Debtor's discharge.  The Court agrees.

When Debtor filed his bankruptcy petition in December 2018, Debtor possessed

the Corvette and its title.  He acknowledged his interest in the Corvette on his initial

schedules, valuing it at $40,000 and claiming he and Woodward each owned a half

interest.  Debtor possessed the title to the Corvette until sometime after the meeting of

creditors on February 8, 2019, when he sent the title to Woodward.  He testified that he

sent Woodward the Corvette's title because it "did me no good and I had to send it back

to him to get him to sign off no matter what happened so he would have had to have it

at some point in time."  Debtor admitted, however, that he did not expect Woodward to

sign the title or return it to him.  Debtor never asked Woodward to return the title to him.

From the date of his petition in December 2018 to August 2019, Debtor stored

the Corvette at a facility in Grand Forks.  In August 2019, Debtor drove the Corvette

from the storage facility to his lake home garage, where he stored it until March 27,

2020, when he finally relinquished possession to the auctioneer retained by the Trustee

to sell the vehicle.  During this entire time—December 2018 to March 2020—Debtor had

the keys and access to the Corvette and could have easily retrieved, moved or

transferred it to the Trustee.

In administering bankruptcy estate assets, the Trustee sought to gain possession

and sell the Corvette.  He demanded Debtor provide him access to the Corvette in a

letter dated May 10, 2019.  In a letter from his attorney dated May 17, 2019, Debtor

claimed: "The Corvette is not titled in Debtor's name, nor is it in his physical

possession."  He failed to mention that he knew where the Corvette was stored and

could retrieve it or otherwise assist the Trustee with his efforts to administer the asset.

Debtor's refusal to assist the Trustee with his efforts to find and sell the vehicle

prompted the Trustee to file a Motion for Turnover in July 2019, seeking an order

requiring Debtor to turn over the Corvette and other nonexempt assets.  Despite this

motion, Debtor drove the Corvette from Grand Forks to his lake home in August 2019

rather than delivering it to the Trustee or inviting the Trustee to retrieve it.

The Court held a hearing on the Trustee's Motion for Turnover on November 5,

2019, which Debtor attended.  On at least two separate occasions during the hearing,

Debtor's attorney at the time represented that Debtor did not have possession of the

Corvette.[21]  At the time of this hearing, Debtor knew the Corvette was stored in his

garage at the lake.  He made no attempt to communicate to the Trustee or the Court

(either before the hearing or immediately after it) that he stored the Corvette at his lake

home garage and could easily access the car and ask his friend and co-owner to

provide the title.  He declined to provide this information to the Court or the Trustee

despite the Court's order that he "relinquish his interest in [the Corvette] and cooperate

with the Trustee in his efforts to gain possession of these items."  T-39.  In discovery

responses Debtor signed in March 2020, Debtor admitted that he had stored the

Corvette at his lake home since October 2019.  On March 12, 2020, more than four

---

[21] At the hearing on the Motion for Turnover, Attorney Brakke stated, "[A]s far as
the Corvette, we don't have possession of it, Your Honor.  The Trustee can go get it
from the person that owns it, if he can."  Later in the hearing, Brakke also said, "And as
to the Corvette, we don't have possession, we don't have title."  Attorney Brakke
testified at trial that he "would not have made [those statements] unless I believed them
to be true."

months after the Court entered its Order on the Trustee's Motion for Turnover, Debtor lied to the Trustee's auctioneer about the location of the Corvette.[22]

At trial, Debtor explained his conduct and representations by parsing his personal definition of "possession." According to Debtor, "In my opinion, possession means in this particular case that I would have the title in my possession with my name on it and I would have the car in my garage." To satisfy his definition of possession, Debtor would need a "signed title or at least a title with my name on it." Debtor "never said that I don't have [the Corvette] in my garage or in storage. The only thing is, I never had the title to it. The signed off title that said I was able to take that car and sell it and consummate that deal." Based on his definition, he claims he never had "possession" of the Corvette. He conceded, however, that he possessed the keys and could have "accessed that vehicle at any time."

Debtor's explanation is spurious. Rather than arranging for the delivery of the title to the Trustee and informing Trustee where to find the Corvette, he claimed he did not have "possession" of the vehicle, thereby concealing the location.[23] In doing so, he

---

[22] On March 12, 2020, Helbling (at the request of Trustee Doeling) asked Debtor about the location of the Corvette. Debtor told Helbling, "You're too late, it's gone. Rick Woodward has picked it up. He took it last week or maybe it was this week I really can't remember." At the time of this statement, the Corvette was stored in Debtor's lake home garage.

Debtor's explanation for lying to Helbling lacks credibility. According to Debtor, he made this statement to Helbling because he "assumed it was going to happen or had happened." At this time, Debtor and Woodward spoke three or four times a week, yet Woodward never told Debtor that he had obtained the Corvette. At trial, Debtor conceded that, if Woodward took the Corvette, he would have mentioned this fact to Debtor during one of their frequent conversations.

[23] Although the typical section 727(a)(2)(A) or (B) concealment involves circumstances where a debtor is accused of concealing his or her ownership interest in assets, many courts have ruled that a debtor may be denied a discharge under these

breached his duty to surrender the Corvette and information related to its location.[24]  His

representations to the Trustee from the spring of 2019 to March 12, 2020, were

---

statutes where he or she concealed the location of assets.  See, e.g., In re Marcus-Rehtmeyer, 784 F.3d 430, 442 (7th Cir. 2015) (defining concealment as "preventing discovery, fraudulently transferring or withholding knowledge or information required by law to be made known" (citation omitted)); Buckeye Ret. Co., LLC v. Swegan (In re Swegan), 383 B.R. 646, 655 (B.A.P. 6th Cir. 2008) ("To give effect to each word in the statute, as we must, we conclude that concealment as used in § 727(a)(2)(A) includes the withholding of knowledge of an asset by the failure or refusal to divulge information required by law to be made known."); R.I. Depositors Econ. Prot. Corp. v. Hayes (In re Hayes), 229 B.R. 253, (B.A.P. 1st Cir. 1999) (defining concealment under section 727(a)(2)(A) as "hiding or withdrawing property from observation, preventing the discovery of property or withholding knowledge of the existence, ownership or location of property." (quotation and citation omitted)); Gasson v. Premier Capital, LLC (In re Gasson), 2021 WL 1222151, at *5 (S.D.N.Y. Mar. 31, 2021) ("To ascertain whether a concealment for the purposes of Section 727(a)(2) has occurred, courts ask: '[d]id the [debtor] place assets beyond the reach of creditors or withhold knowledge of assets by failing or refusing to divulge information to which creditors were entitled?'" (citation omitted)); Barbacci v. Miller (In re Miller), 2020 WL 2554232, at *3 (Bankr. N.D. Ohio May 19, 2020) ("A 'concealment as used in § 727(a)(2)(A) includes the withholding of knowledge of an asset by the failure or refusal to divulge information required by law to be made known.  Under this standard, concealment occurs when a debtor fails to adequately and truthfully answer a question at a state-court debtor's examination, at a 341 meeting of creditors, within a bankruptcy petition, or in other similar situations.'" (citations omitted)); Weatherall Radiation Oncology v. Caletri (In re Caletri), 517 B.R. 655, 666-67 (Bankr. E.D. La. 2014) ("Concealing debtor property includes conduct such as placing assets beyond the reach of creditors or withholding knowledge of the assets by failure or refusal to divulge information." (footnote omitted)); Flush Sav. Bank v. Vidro (In re Vidro), 497 B.R. 678, 686 (Bankr. E.D.N.Y. 2013) ("'Concealment refers to placing assets beyond the reach of creditors or withholding pertinent information, and need not involve an actual transfer.'" (citation omitted)); Wieland v. Miller (In re Miller), 448 B.R. 551, 572 (Bankr. N.D. Okla. 2011) (finding that assuming control over and relocating estate assets without informing the creditors of the location of the property was concealment under section 727(a)(2)(A)); In re Lanier, 383 B.R. 302, 307 (Bankr. E.D.N.C. 2008) (noting that there was prima facie evidence that debtor's discharge could be denied under section 727(a)(2)(B) because he "concealed the location of a sport utility vehicle and boat, which would be property of the estate.").

[24] Under section 521(a)(4), the debtor shall surrender property of the estate and information related to it to the Trustee.  11 U.S.C. § 521(a)(4).  The statute imposes a duty upon the debtor to make his or her assets and information related to them available and stand ready to deliver it upon request.  See In re Trujillo, 485 B.R. 238, 249-50 (Bankr. D. Colo. 2012).  Debtor breached this duty.  He did not make available to the

intentionally designed to avoid the sale of the Corvette for the benefit of creditors.  His

intent to hinder, delay and defraud creditors could not be more clear when he testified

that he was concerned with protecting Woodward's interest because "Rick Woodward is

a personal friend of mine.  We have been doing business together for many years.  I'd

say probably 20 years.  We have done a lot of things together.  When you have a friend,

you try to protect his assets."

Debtor argues that Reimer ultimately complied with the Trustee's demands and

the Court's Order regarding turnover by assisting Helbling in obtaining possession of the

Corvette on March 27, 2020, and suggests that Debtor's eventual cooperation serves as

a defense to the Trustee's section 727 causes of action.   Debtor's efforts to cooperate

with Helbling a year after the Trustee began demanding turnover do not negate the

other evidence showing his fraudulent intent and do not serve as a defense to the

Trustee's section 727(a)(2)(B) cause of action because the Trustee does not have to

prove harm.  See In re Richmond, 429 B.R. at 302 ("[P]roof of harm is not a required

element of a cause of action under Section 727.") (quotation omitted); see also Wise v.

Wise (In re Wise), 590 B.R. 401, 430 (Bankr. E.D. Mich. 2018) ("[P]roof of harm is not a

required element of a cause of action under Section 727. . . .  [A] fair reading of the

statute makes it clear that so long as there is an intent to hinder, delay, or defraud, in

_____

Trustee information about the location of the Corvette even after: (1) the Trustee
demanded access to the vehicle in a letter sent to Debtor's counsel in May 2019; (2) the
Trustee filed a Motion for Turnover in July 2019; (3) the Court held a hearing on the
Trustee's motion; and (4) the Court ordered Debtor to cooperate with the Trustee in his
efforts to gain possession of these items in November 2019.  The record shows that the
Trustee did not learn Debtor stored the Corvette at his lake home until he received
Debtor's responses to interrogatories in March 2020, after which the Trustee took
immediate action to obtain the vehicle.

combination with an act such as a transfer, then a debtor should be denied the privilege

of discharge. The statute does not provide that the creditors must have, in fact, been

hindered, delayed or defrauded." (quoting Smiley v. First Nat'l Bank of Belleville (In re

Smiley), 864 F.2d 562, 569 (7th Cir. 1989)).  Accordingly, the Trustee met his burden of

proving the elements under section 727(a)(2)(B).  Debtor's discharge is denied for this

reason as well.

### 3.     727(a)(4)

Section 727(a)(4)(A) bars the entry of discharge if a debtor knowingly and

fraudulently made a false oath or account in or in connection with a case.  11 U.S.C. §

727(a)(4)(A).  The Trustee argues that the Court should deny Debtor his discharge

because he made misrepresentations "significantly undervaluing a number of assets as

well as failing to include a number of assets and transfers in his bankruptcy schedules

as listed above in the statement of facts."  Doc. 110 at 12.  Given the Court's

determination that Debtor's discharge is denied under section 727(a)(2), it is not

necessary to reach the question of whether his discharge should also be denied under

section 727(a)(4).

### 4.     11 U.S.C. § 727(a)(6)

Section 727(a)(6)(A) provides that a discharge shall not be granted if "the debtor

has refused, in the case[,] to obey any lawful order of the court, other than an order to

respond to a material question or to testify."  11 U.S.C. § 727(a)(6)(A).  The Court need

not decide this issue because it has already determined that denial of discharge is

appropriate under section 727(a)(2)(A) and (B).

III.    **CONCLUSION**

The Court considered all other arguments and deems them to be without merit.

For the reasons stated above, it is **ORDERED** that:

A.  Debtor is denied a discharge under 11 U.S.C. §§ 727(a)(2)(A) and (B).  The

Trustee's causes of action under 11 U.S.C. §§ 727(a)(4)(A) and (6)(A) are

dismissed without prejudice because they are moot.

B.  The Trustee's motion to amend his Complaint to add a cause of action under

11 U.S.C. § 727(a)(5) is denied because it is moot.

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**

Dated:  April 26, 2021.


SHON HASTINGS, JUDGE
UNITED STATES BANKRUPTCY COURT